# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **PROF-2014-S2 LEGAL TITLE TRUST II, BY U.S. BANK NATIONAL ASSOCIATION, AS LEGAL TITLE TRUSTEE** | ) ) ) ) ) | |
| **PLAINTIFF** | ) ) | |
| **v.** | ) ) | |
| **DODI S. SIDELINGER,** | ) ) | |
| **DEFENDANT** | ) ) | **CIVIL NO. 2:19-cv-220-DBH** |
| **AND** | ) ) | |
| **FIRST TENNESSEE BANK, N.A.** *f/k/a First Horizon Home Loan Corporation*; **DENNIS CAREY; TYGDON, LLC,** | ) ) ) ) ) | |
| **PARTIES-IN-INTEREST** | ) | |

## DECISION AND ORDER ON MOTION TO DISMISS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is a mortgage foreclosure dispute with a twist. The mortgagor has been through bankruptcy and obtained protection from personal liability. As a result, she agrees to foreclosure of the first mortgage on her residence. But a junior mortgagee resists the foreclosure. The junior mortgagee has moved to dismiss the first mortgagee's complaint and seeks summary judgment that he has title superior to that of the first mortgagee. The first mortgagee has filed a cross motion for summary judgment on the junior mortgagee's claim of superior

title.[1]  I conclude that the plaintiff first mortgagee's complaint should not be dismissed, and that the junior mortgagee does not have superior title.

## MOTION TO DISMISS

The junior mortgagee Dennis Carey (Carey) moves to dismiss the first mortgage foreclosure complaint on two primary grounds—that an assignment has destroyed the plaintiff's standing and the court's jurisdiction, and that litigation abuse by the plaintiff's lawyers justifies dismissal.

### *Assignment of the Plaintiff's Interest*

The mortgagee that filed the first mortgage foreclosure complaint in this Court on May 16, 2019, was "PROF-2014-S2 Legal Title Trust II, by U.S. Bank National Association, as Legal Title Trustee" (PROF-2014).  On April 1, 2020, PROF-2014 assigned its interest to "1900 Capital Trust III, by U.S. Bank Trust National Association, not in its individual capacity but solely as certificate trustee" (Capital Trust III).

New counsel entered his appearance for the assignee Capital Trust III on May 5, 2020, referring to Capital Trust III as the plaintiff, but without stating that there had been an assignment (ECF No. 44).  New counsel then filed a Local Rule 56 Memorandum on May 11 on behalf of "Plaintiff," listing PROF-2014 in the caption as the plaintiff and making no reference to Capital Trust III (ECF No. 46).  The assignment deed was recorded in the Cumberland County Registry of Deeds on May 18, 2020.  That same day, the lawyers who originally filed the foreclosure complaint moved to withdraw (ECF No. 49), and the motion was

---

[1] This claim lies behind both the junior mortgagee's declaratory judgment counterclaim and his second affirmative defense.

2

granted (ECF No. 50).  At a telephone conference the next day before the Magistrate Judge, the successor lawyers said that the "plaintiff" had standing and the right to foreclose, and they made a similar statement in responding to Carey's motion for summary judgment.  Mot. to Dismiss at 2-3 (ECF No. 59).

Carey argues that the assignment from PROF-2014 to Capital Trust III after the lawsuit was underway destroyed standing, id. at 8-9, and diversity jurisdiction, Carey Reply at 6-7 (ECF No. 69), and that the lawyers' statements to the Magistrate Judge and in written filings amounted to a lack of candor to the Court, Mot. to Dismiss at 2-3, 12-13, all of which require dismissal with prejudice.

The Federal Rules of Civil Procedure recognize that transfers of interest may occur during a federal lawsuit.  Rule 25(c) provides: "If an interest is transferred, the action may be continued by . . . the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  No such motion was made here, and I find no lack of candor.  Thus, Rule 25 disposes of Carey's argument that the mid-litigation assignment destroyed PROF-2014's standing.  If there was some prejudice to Carey's litigating position arising from the assignment, he could have moved to substitute or join Capital Trust III.[2]

---

[2] This conclusion is consistent with Maine law as announced by the Law Court: "At a minimum, [s]tanding to sue means that the party, *at the commencement of the litigation*, has sufficient personal stake in the controversy to obtain judicial resolution of that controversy."  Mortg. Elec. Registration Sys. v. Saunders, 2010 ME 79, ¶ 7, 2 A.3d 289 (emphasis added) (quotation marks omitted).  Like Federal Rule 25, Maine Rule 25 can be "used to substitute a second party for the original party when, in the course of litigation or pendency of an appeal, the original party's interest ends or is transferred."  Id. at ¶ 17.

The original complaint asserted diversity jurisdiction, Compl. ¶ 1, and Carey admitted there was diversity.  Carey Answer ¶ 1.  The law is clear that diversity jurisdiction is measured as of the filing of the complaint, and that later transfers do not affect it.  Freeport-McMoRAN, Inc. v. K N Energy, Inc., 498 U.S. 426 (1991).  In Freeport-McMoRAN, the Supreme Court reasoned that "[a] contrary rule could well have the effect of deterring normal business transactions during the pendency of what might be lengthy litigation."  Id. at 428.  That reasoning applies here.

In sum, the assignment does not support dismissal of the complaint.

### Litigation Abuse

Carey says the first mortgagee committed litigation abuse because it served a motion for sanctions under Federal Rule 11.  Mot. to Dismiss at 3-4. The first mortgagee never filed that motion with the Court.[3]  What the first mortgagee's lawyers served on Carey and his lawyer is a preliminary step that Rule 11 requires so as to give the other party a chance to correct challenged conduct.  Fed. R. Civ. P. 11(c)(2).  It is not a basis to dismiss the lawsuit.  And it is not itself a violation of Rule 11, because the standard of Rule 11 is for "[r]epresentations to the Court."  Fed. R. Civ. P. 11(b).

Carey also says the lawsuit should be dismissed because PROF-2014 gave him 2446 images that were not in searchable format or organized.  Mot. to Dismiss at 4.  But that discovery was the result of Carey's requests to the

---

[3] Carey does attach it to his motion to dismiss.

Magistrate Judge and the Magistrate Judge's Order of March 16, 2020 (ECF No. 38). There is no showing that Carey requested any different discovery format.

Finally on this topic, Carey says that after counsel had agreed to stipulations for the cross motions for summary judgment, the first mortgagee's lawyer changed the title of the allonge added to the Stipulated Record as Exhibit 2 to read "2 Exhibit Prior Allonge" on ECF. Mot. to Dismiss at 4. The first mortgagee's lawyer has responded that he did not intentionally change the title, but simply used the document's name as saved on his computer and that he is willing to rename it "to whatever reasonable alternative Carey proposes." Pl.'s Opp'n & Cross Mot. at 11 (ECF No. 66). Carey has not addressed the issue or the lawyer's offer in his Reply. The title change is obviously an insignificant error that does not affect the outcome of the motion practice and does not justify dismissal.

Carey's motion to dismiss is **DENIED**.

### CROSS MOTIONS FOR SUMMARY JUDGMENT

Carey seeks summary judgment against the first mortgagee on the basis that it has not produced an adequate note, mortgage, or notice of right to cure, and that Carey has superior title. The first mortgagee argues that it has produced a sufficiently adequate note, mortgage deed, and notice of right to cure to avoid summary judgment and get to a factfinder.[4] It also argues that Carey does not have superior title.

---

[4] It bears emphasizing that the first mortgagee is not seeking summary judgment of foreclosure, only summary judgment that Carey does not have superior title. It is Carey who is seeking summary judgment that the first mortgagee cannot foreclose. I view conflicts in the evidence on that point in the light most favorable to the nonmoving party, the first mortgagee.

*Validity of Note*

Carey contends that the first mortgagee cannot foreclose because it lacks adequate evidence that it is the holder of the mortgage note.  Mot. for Summ. J. at 3 (ECF No. 55).[5]  I disagree.  The mortgagee on the original mortgage note was First Horizon Home Loan Corporation.  (ECF No. 1-2).  Although the note itself is indorsed in blank with the word "void" handwritten across that indorsement,[6] there is also an allonge.  The allonge's heading says "THIS ALLONGE IS TO BE PART OF THE NOTE"), and the allonge has an indorsement by "First Horizon Home Loans, a division of First Tennessee Bank National Association, As successor in interest by merger to First Horizon Home Loan Corporation, It's [sic] Attorney in Fact,"[7] and another indorsement that says "Pay to the order of" (the payee is left blank) and "Without Recourse First Horizon Home Loans a division of First Tennessee Bank National Association."  The word "void" does not appear on this allonge.  If the allonge is affixed to the note, that makes the combined

---

[5] Carey has referred to the documents at a number of places in his SMF, locating them in the bankruptcy proof of claim filing at ECF No. 54-12 and Exhibit B to the plaintiff's complaint in this Court.

[6] Carey says that indorsements on the mortgage note presented at the mortgagor's bankruptcy proceeding (ECF No. 54-12) differ from those attached to the foreclosure complaint (ECF No. 1-2).  Mot. for Summ. J. at 4.  Specifically, he says the bankruptcy version of the note was unindorsed, whereas the one attached to the complaint "purports to make an undated endorsement *in blank* . . . which thereafter was marked *void* on its face."  Id.  Any differences in the documents may be argued to the factfinder, but they do not support summary judgment in Carey's favor.

[7] Carey argues that the first mortgagee has not produced evidence of a power of attorney that authorized First Horizon Home Loans to act as attorney in fact, Mot. for Summ. J. at 6, but he cites no authority for how that entitles him to summary judgment.  He also argues that the two indorsements together amount to a nullity because the transfer goes from one unincorporated entity, First Horizon Home Loans, to the same entity.  Id. at 5.  But even if the indorsements are poorly worded, their effect is clear.  Last, he argues that there is no corporate resolution and no authorization by the Comptroller of the Currency for First Tennessee Bank to create a division.  Id.  He has not shown why those are requirements.  In any event, none of Carey's arguments about the note suffices to render summary judgment in his favor.

document a negotiable instrument, and it is held by the plaintiff.[8]  See 11 M.R.S.
§ 3-1204(1) ("For the purpose of determining whether a signature is made on an
instrument, a paper affixed to the instrument is a part of the instrument."); Bank
of Am., N.A. v. Greenleaf, 2014 ME 89, ¶ 10, 96 A.3d 700 ("[11 M.R.S. §] 3-1301
permits a party to enforce a note if it is the 'holder' of the note, that is, if it is in
possession of the original note that is indorsed in blank.").[9]

Carey argues that despite its heading that "THIS ALLONGE IS TO BE PART
OF THE NOTE," the allonge in fact was *not* affixed to the mortgage note, Mot. for
Summ. J. at 6-7; Carey Statement of Material Facts (SMF) ¶ 40 (ECF No. 55-1),
but he offers no evidence for that assertion.  He also says the allonge does not
"evidence any physical indicia of being affixed to the mortgage note," Carey SMF
¶ 41, but he has not presented the original nor asked that the first mortgagee do
so.

### *Validity of Mortgage Deed*

Carey says the first mortgagee cannot prove it is the owner of the mortgage
due to defects in two assignments.  Mot. for Summ. J. at 8.

In June 2006, the mortgagor executed a first mortgage naming First
Horizon Home Loan Corporation as the lender (ECF No. 1-3); see Stipulated R.
(ECF No. 54).  In May 2010, First Horizon Home Loans, a Division of First
Tennessee Bank National Association, as Successor in Interest by Merger to First

---

[8] The documents on ECF are copies.  But the plaintiff's lawyers say they have the originals and
are prepared to submit them to the Court for examination when necessary.  See Pl. SMF ¶ 23
(ECF No. 56) ("Plaintiff will make the original note available for the Court's and the parties'
inspection as necessary.").
[9] Carey points to the existence of another allonge in the record, ECF No. 55-1 ¶ 26, arguing that
the two allonges are in impermissible conflict.  Mot. for Summ. J. at 7-8.  This may be an issue
for the factfinder, but it is not a ground for summary judgment in Carey's favor.

Horizon Home Loan Corporation, assigned the mortgage to Federal National Mortgage Association (ECF No. 1-4).  Carey & Pl. SMFs ¶ 43 (ECF Nos. 55-1, 56).

Attached as part of the assignment exhibit is the merger agreement between First Tennessee Bank National Association and its affiliate First Horizon Home Loan Corporation.  The agreement provided that First Tennessee Bank National Association would be the surviving entity and would acquire all of First Horizon Loan Corporation's property.  Carey contends that the 2010 assignment was invalid because the merger agreement did not authorize First Horizon Home Loans to be designated a division of First Tennessee Bank National Association. Mot. for Summ. J. at 9; see Carey & Pl. SMFs ¶¶ 44-47.

Carey offers no legal authority, however, to support his theory that using the name "First Horizon Home Loans, a Division of First Tennessee Bank National Association, as Successor in Interest by Merger to First Horizon Home Loan Corporation" rendered the assignment invalid.  Maine law does not prohibit foreign corporations from using trade names in conducting business.  See 13-C M.R.S. § 404(3) (authorizing foreign and domestic corporations to conduct business in Maine under an "assumed" name); id. § 404(1) (defining an "assumed name" to include a "trade name").[10]

A second assignment was made in January 2017, when Nationwide Title Clearing, Inc., acting as attorney in fact for Federal National Mortgage

---

[10] Moreover, the assignment may be valid under 33 M.R.S. § 353-A(2): "A duly recorded satisfaction piece or instrument made and recorded for at least 2 years in the registry of deeds of the county or district in which the real property is located with the intent to cancel and discharge or assign a mortgage of real estate, fully identifying the mortgage intended to be canceled and discharged or assigned, but not drawn in accordance with statutory requirements is considered valid."

Association, assigned the mortgage to PROF-2014 (ECF No. 1-5).  Attached as part of the exhibit is a "Limited Power of Attorney" agreement, dated August 30, 2016, which purports to allow Nationwide to "execute" the "assignment . . . of mortgage loans."  There is a stamp on the mortgage assignment itself showing it was recorded in the Cumberland County Registry of Deeds on January 17, 2017.  The power-of-attorney agreement has a stamp saying it was "eRecorded in Philadelphia PA" on December 21, 2016, and a second stamp saying it was recorded in the Cumberland County Registry of Deeds on June 9, 2017.

Carey argues that this assignment was invalid because the limited power of attorney agreement giving Nationwide authority to assign was not recorded in Cumberland County until after the assignment was made.  Mot. for Summ. J. at 9-10.  He points to trial court cases indicating that power of attorney agreements enabling assignments must be recorded in the registry of deeds.  See U.S. Bank Nat'l Ass'n v. Carney, No. CARSC-RE-15-032, 2018 WL 1002004, at *3 (Me. Super. Ct. Jan. 16, 2018) (citing Cowan & Scannell, Maine Real Estate Law and Practice §§ 10:10, 24:20 at 433, 975 (2d ed. 2007))[11]; Carrington Mortg. Servs., LLC, v. Gionest, No. 2:16-cv-00534-NT, 2020 WL 1303554, at *3 (D. Me. Mar. 19,

---

[11] The treatise that Carney relied upon has since been revised and no longer includes its prior statement that a power to convey or mortgage real estate must be recorded.  See Cowan & Scannell, Maine Real Estate Law and Practice §§ 10:10, 24:20 at 41-42, 86-87 (Supp. 2019-2020).  The earlier edition of the treatise did not cite a statute or case for the proposition and the Maine Law Court has not spoken on the matter.  In 1995, the Law Court said in the context of a mortgage that did not rely on a power of attorney that a mortgagee could foreclose where the mortgage was unrecorded.  Mott v. Lombard, 655 A.2d 362, 364 (Me. 1995).  I am not convinced that there is a legal requirement to record a power of attorney in the foreclosure context.  But as I explain, I need not decide that issue here, because the post-assignment recording is sufficient, assuming there is such a requirement.

2020) (citing <u>Carney</u>).  But these sources do not indicate what happens where, as here, the power is recorded after the instrument.[12]

Even if a power must be recorded for an assignment to be effective, I decline to adopt Carey's theory that recording of the power must take place before the assignment for the assignment to be effective.  Recording acts are designed to protect the interests of innocent purchasers from undisclosed attachments.  <u>See</u> <u>First Auburn Tr. Co. v. Buck</u>, 16 A.2d 258, 260 (Me. 1940).  I am not concerned here with whether the timing of the recording creates future title issues for the first mortgagee; instead, the issue is whether the first mortgagee now has authority to foreclose.  <u>Cf.</u> <u>Mott v. Lombard</u>, 655 A.2d 362, 364 (Me. 1995) (explaining that the foreclosure statute did not "prohibit foreclosure of an unrecorded mortgage" and that "record title is irrelevant" to foreclosure).  Under the Maine Uniform Power of Attorney Act, a power of attorney is "effective when executed."  18-A M.R.S. § 5-909(a) (2012).[13]  Carey has failed to show that the 2017 assignment was ineffective.

### *Notice of Default and Right to Cure*[14]

Carey argues that PROF-2014's notice of default and right to cure is insufficient.  Mot. for Summ. J. at 11-12.  First, he complains that the notice was sent by a servicer rather than the first mortgagee itself and that the first

---

[12] I do not find persuasive the plaintiff's suggestion that the Pennsylvania electronic recording, which took place before the assignment was made, would satisfy a requirement (if there was one) that powers of attorney enabling assignments of Maine mortgages must be recorded in the registry of deeds.  <u>See</u> Pl.'s Opp'n & Cross-Mot. at 7.

[13] 18-A M.R.S. § 5-909(a) has since been recodified at 18-C M.R.S. § 5-909(1); 18-C M.R.S. § 5-906(2) ("A power of attorney executed on or after July 1, 2010 but before September 1, 2019 is valid if its execution complied with former Title 18-A, section 5-906.").

[14] I doubt that Carey has standing to challenge the notice of default and right to cure that went to the borrower/mortgagor, but I will address his arguments anyway.

mortgagee has not shown an agency relationship with the servicer.  Id. at 11.
The Maine Law Court has made clear "that a mortgagee may delegate to an
agent—such as a loan servicer—its duty to provide a notice of the right to cure."
Wilmington Sav. Fund Soc'y, FSB v. Needham, 2019 ME 42, ¶ 18, 204 A.3d
1277; see 14 M.R.S. § 6111(1).  Carey says that PROF-2014 needed to "produce
a servicing agreement or grant of power of attorney" in order to establish an
agency relationship.  Mot. for Summ. J. at 11.  But Needham did not establish
such a requirement.  See Needham, 2019 ME 42, ¶ 10, 204 A.3d 1277.  Here, it
is sufficient that the letter identifies the loan servicer sending it and states that
it is being sent "on behalf of PROF-2014-S2 Legal Title Trust," the first mortgagee
(ECF No. 1-8).

Second, Carey argues that the notice of default and right to cure is
defective because it purports to ask the borrower to pay the cure amount when
the bankruptcy court authorized only in rem relief against the property.  Mot. for
Summ. J. at 12.  But the letter states explicitly: "To the extent your obligation
has been discharged or is subject to the automatic stay in a bankruptcy case,
this notice is for informational purposes only and does not constitute a demand
for payment or an attempt to collect a debt as your personal obligation."  (ECF
No. 1-8).  Carey has not shown the notice of default and right to cure to be
defective.

### Junior Mortgagee's Interest and the Claim of Superior Title

In 1975, Maine statutes introduced "Foreclosure Proceedings by Civil
Action," in other words foreclosure via a judicial proceeding.  See P.L. 1975, ch.
552, § 5 (enacting Title 14, chapter 713, subchapter 6).  That foreclosure method

separates proceedings for "a mortgage of first priority" from "any mortgage other than one of the first priority."  14 M.R.S. § 6321.  Carey's junior mortgage is one of the latter.  To foreclose such a mortgage, a junior mortgagee like Carey can bring a civil action in the District or Superior Court against all parties in interest except for parties in interest "having a superior priority." Id.  (Here, that is the plaintiff, the first mortgagee.)  Any superior interest will not "be affected by the [junior mortgage foreclosure] proceedings, but the *resulting sale* under section 6323 is of the . . . mortgagor's equity of redemption only." Id. (emphasis added). If after a hearing the court determines that a mortgage condition was breached, "a judgment of foreclosure and sale *must* issue providing that if the mortgagor or the mortgagor's successors, heirs and assigns do not pay the sum that the court adjudges to be due and payable, with interest within the period of redemption, the mortgagee *shall proceed with a sale* as provided." Id. § 6322 (emphasis added).  If the mortgagor does not redeem within the time period allowed, "the mortgagee *shall* cause notice of a public sale of the premises," with the first publication to occur not more than 90 days after the redemption period. Id. § 6323(1) (emphasis added).  There is nothing permissive in all that language. In other words, the statute makes a public sale a mandatory part of the judicial foreclosure process.  The junior mortgagee can itself choose to bid at the public sale and if it is the highest bidder, it then has no obligation to account for any surplus on any subsequent sale it might make of the interest it acquired. Id.

In 1993, Maine's Law Court treated public sale as part of the judicial foreclosure proceeding: "in the case of a second mortgage foreclosure, the interest foreclosed on and the interest subsequently sold at a public sale is not

the fee interest in the land . . ., but the mortgagor's equity of redemption, . . . [the] right to redeem the property from the first mortgagee . . . ." Brickyard Assocs. v. Auburn Venture Partners, 626 A.2d 930, 933 (Me. 1993). At the public sale the "second mortgagee . . . foreclosed and subsequently sold to itself . . . [the] right to redeem the property" from the senior mortgagee. Id. at 934. Likewise, in 1996, it stated:

> The judicial mortgage foreclosure procedure set forth in sections 6321-25 establishes a unified civil action for foreclosing the mortgagor's equity of redemption and collecting from the mortgagor any deficiency. While the prosecution of a foreclosure suit begins with a complaint for the issuance of a judgment of foreclosure and sale, . . . the action *culminates* with the report of the *sale* to the court and an order for the assessment of any deficiency or the distribution of any surplus.

Key Bank of Me. v. Walton, 673 A.2d 701, 703 (Me. 1996) (emphasis added); accord Kennebec Fed. Sav. & Loan Ass'n v. Kueter, 1997 ME 123, ¶ 7, 695 A.2d 1201 ("The judicial foreclosure statute establishes a single, inherently equitable proceeding, of which the assessment of a deficiency is an incidental part."). It is true that the Law Court has held that a minor error in the public sale process does not void the entire foreclosure proceeding, Keybank Nat'l Ass'n v. Sargent, 2000 ME 153, ¶¶ 36-38, 758 A.2d 528; accord United States v. Harriman, 851 F. Supp. 2d 190, 194 (D. Me. 2010), but it has never suggested that foreclosure can end without a public sale.[15] See generally Cowan & Scannell, § 13:15 at 534 ("A judicial mortgage foreclosure proceeding establishes a unified civil action for

---

[15] The public sale may generate some amount that would then reduce the mortgagor's debt to the junior mortgagee. See Cadle Co. v. LCM Assocs., 2000 ME 73, ¶ 9, 749 A.2d 150 (discussing the benefit to the mortgagor of the time limits for the public sale). In HSBC Bank USA N.A. v. Gordon, No. RE-12-92, 2014 WL 7920844 (Me. Super. Ct. Aug. 12, 2014), Maine Superior Court Justice Warren prohibited any deficiency judgment where a public sale was excessively delayed, but he did not suggest that the public sale was not required.

13

foreclosing the mortgagor's equity of redemption and collecting from the mortgagor any deficiency."), § 13:19 at 542-45 (laying out the public sale process that follows the expiration of the redemption period) (2d ed. 2007).

It is undisputed that Carey used this statute to foreclose his junior mortgage when the mortgagor defaulted. In 2010, he obtained a judgment of foreclosure and sale from Cumberland County Superior Court. Carey & Pl. SMFs ¶¶ 83-86. But for reasons the record does not disclose, he never conducted the public sale that the judgment required, and ten years have passed. Neither he nor anyone else ever purchased the mortgagor's equity of redemption that section 6321 allows.

But Carey argues that he need not conduct the mandatory public sale. He says: "Carey remains without further judicial process vested in the equities of redemption of the first mortgage. Notice and sale after termination of period of redemption is not legal precedent to perfection of vesting of equities of redemption." Mot. for Summ. J. at 17 (footnotes omitted). If Carey is correct, it is difficult to make sense of the statute's recognition that the mortgagee can *purchase* the equity of redemption at the public sale. And it is inconsistent with Brickyard's statement that the mortgagor's equity of redemption is what is to be sold at the public sale, and that the junior mortgagee may choose to purchase it at that time.

Carey gains some traction from language in Bankruptcy Estate of Everest v. Bank of America, 2015 ME 19, 111 A.3d 655. That was a case where the junior mortgagee, like Carey, had failed to conduct a public sale of the mortgagor's equity of redemption after foreclosure. But in Everest, the junior

14

mortgagee also failed to appear at the later senior mortgage foreclosure proceeding even though it had notice.  Id. ¶¶ 18-19.  The Law Court found that the junior mortgagee's failure to appear at the later senior foreclosure proceeding forfeited any rights it might have had.  Id. ¶ 23.  That is the ultimate holding of Everest.

In reaching that conclusion, the Law Court stated that it first had to "classify the nature of the right [the junior mortgagee] received from its junior foreclosure."  Id. ¶ 16.  It said that when the junior mortgagee "obtained the junior foreclosure judgment . . . what it received was [the mortgagor's] equity of redemption for the senior mortgage."  Id. ¶ 18.[16]  In the next sentence the Law Court stated that the junior mortgagee "did not sell this interest within the specified time period pursuant to 14 M.R.S. § 6323," but it did not discuss the significance of that failure, moving instead directly to the failure to appear at the senior mortgage foreclosure proceeding and that failure's dispositive effect.

As I have said, Everest's holding was that the junior mortgagee's failure to participate in the senior foreclosure proceeding eliminated any interest it had.  I do not read the Everest language about the junior foreclosure and failure to conduct a public sale as holding that the junior mortgagee was not *required* to conduct a public sale.  That would read the mandatory public sale language out of the statute and ignore the Brickyard interpretation.  It is more reasonable to read the Law Court's language that the junior mortgagee "received . . . the equity

---

[16] In doing so, it relied on language from Smith v. Varney, 309 A.2d 229, 232 (Me. 1973) a pre-civil-action foreclosure case that stated: "when the second mortgagee forecloses the mortgagor, the whole equity of redemption vests in him."  But Smith v. Varney was a declaratory judgment action that examined an earlier foreclosure statute without the public sale provision of the current civil action foreclosure statute.  See R.S. ch. 104 (1930).

of redemption" at the time of the foreclosure judgment as meaning that the junior mortgagee "received" it for the purpose of sale to another, or itself, at the "resulting sale" that section 6321 refers to. Carey's contrary reading would mean that a junior mortgagee could obtain a foreclosure judgment, then ignore altogether the court's order to conduct a sale.

I conclude that Carey's foreclosure did not gain him title superior to that of the first mortgagee. Indeed, even if his foreclosure were complete, he would have only the equity of redemption against the first mortgagee, *i.e.*, the ability to pay the entire obligation on the first mortgage and thereby take unencumbered title.

In support of his superior title argument, Carey also says that a 2013 modification agreement between the mortgagor and first mortgagee resulted in prohibited future advances. Mot. for Summ. J. at 19.[17] Under Maine law "'Future advances' means debts or obligations secured by a mortgage that arise subsequent to the execution and recording of the mortgage." 33 M.R.S. § 505(1)(B).[18] No evidence in the record suggests that the 2013 agreement resulted in future advances, only that it capitalized the accumulated deficiency, lowered the interest rate, and extended the term. Carey & Pl. SMFs ¶¶ 91, 93; Pl. Additional Facts ¶ 123; (ECF No. 1-7). Those are not future advances. As

---

[17] He does not challenge a 2007 loan modification agreement.
[18] PROF-2014 argues that the first mortgage permits future advances, citing the Residential Construction Loan Rider Including Security Agreement to the Deed of Trust/Mortgage. Pl.'s Opp'n & Cross Mot. at 16; see Ex. C: Mortgage at 19 (ECF No. 1-3). But that provision contains no dollar limit and Maine law extends the priority secured interest to future advances only "up to a total amount outstanding from time to time as stated in the mortgage instrument." 33 M.R.S. § 505(2); see Salem Capital Grp., LLC v. Litchfield, 2010 ME 49, ¶ 5, 997 A.2d 720. The only "total amount" in the mortgage deed is the amount of the debt, $388,000. Ex. C: Mortgage at 2.

the Law Court has stated, something "that merely changes the *form* of the evidence of the indebtedness is insufficient to constitute payment of a debt and discharge of a mortgage." St. Agatha Fed. Credit Union v. Ouellette, 1998 ME 279, ¶ 10, 722 A.2d 858. St. Agatha quoted authority that "[t]he holder of a junior encumbrance is regarded as taking his interest subject to possible extension of time of payment of the debt secured by the senior encumbrance." If the modification "simply altered the repayment terms of the [original] obligation, . . . the [modification] is secured by the [original] mortgage."). Id.[19] And Carey's incomplete foreclosure in 2010 did not make the modification agreement a "nullity." Mot. for Summ. J. at 18.

Finally, I reject Carey's arguments that somehow the bankruptcy court proceedings gave him rights superior to the first mortgagee or limited the first mortgagee in what it can realize from foreclosing the mortgage and selling the real estate. The bankruptcy court order lifting the stay on the mortgagee's right to foreclose has no such language or effect. Consent Order (ECF No. 54-9).[20]

In short, Carey is unable to demonstrate superior title.

---

[19] The court explained that a modification that arises subsequent to the mortgage is not a future advance when it does not involve additional advances of money. See St. Agatha Fed. Credit Union v. Ouellette, 1998 ME 279, ¶ 11, 722 A.2d 858.

[20] In fact, the bankruptcy judge stated during the court's July 2016 hearing on confirmation of the third amended Chapter 13 plan that Carey did not own the equity of redemption. In overruling Carey's objection to confirmation, the bankruptcy judge said that "the Debtor has an interest in [the] property that is the equity of redemption," thus rejecting Carey's argument that he owned the equity. Hr'g Tr. at 20 (ECF No. 54-13). The judge noted that Carey never conducted a sale and "there are certain requirements under the statute to sell the property within a certain time period." Id. at 20-21.

I therefore **DENY** summary judgment to Carey and **GRANT** summary judgment to PROF-2014 on Carey's second affirmative defense and counterclaim of superior title.

**SO ORDERED.**

**DATED THIS 26TH DAY OF OCTOBER, 2020**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

18